UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                                                        No. 21-cr-20510

v.                                                              Hon. Judith E. Levy

D-8 FRANK JENNINGS

    Defendant.
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

During the Covid-19 pandemic, when millions of Americans lost their jobs because of widespread lockdowns and relied on unemployment assistance to survive, Frank Jennings and his co-conspirators cheated the system to make easy money. They stole and traded the personal information of hundreds of victims and filed fraudulent unemployment insurance claims in 19 states, pocketed the benefits paid on the fraudulent claims, and bragged about their exploits. The co-conspirators filed or caused to be filed approximately 450 fraudulent UI claims with an actual loss of $1,471,599 and an intended loss of $4,997,672.

Frank Jennings was charged with eight other defendants in a Superseding Indictment with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count 1), and one count of aggravated identity theft, in violation of 18 U.S.C. §1028A (Count 8). He pleaded guilty to both counts pursuant to a Rule

1

11 agreement. For the reasons set forth below, and assuming the Court agrees to the actual loss number, the government recommends a sentence at the bottom of Jennings's guideline range, to be followed by a two-year term of supervised release.

I.      FACTS AND PROCEDURAL HISTORY

   A.   **Sharodney Harrison Develops an Unemployment Insurance Fraud Scheme.**

Between on or about February 1, 2020, to on or about January 26, 2021, Sharodney Harrison devised a scheme to defraud several states and the federal government by filing fraudulent unemployment insurance (UI) claims using the personal information of individuals without their knowledge or consent, or who were not eligible to receive benefits, or both. (PSR ¶ 16.)[1]

Sharodney conspired with other individuals, including Frank Jennings, to assist with and participate in his scheme. To further the goals of the scheme, the co-conspirators: (1) created email accounts to link with UI claims; (2) submitted fraudulent UI claims; (3) re-certified the UI claims; (4) used their telephone numbers to fraudulently verify identity in connection with the UI claims; (5) created online bank accounts in which the UI benefits were deposited; (6) collected

---

[1] References to the PSR in this matter are to the Addendum/Revised Presentence Report, filed by the Probation Department on September 14, 2023. (ECF No. 258.)

2

mail for the UI claims; and (7) collected mail with pre-paid cards on which UI benefits had been deposited. (*Id.*) Sharodney and other members of the conspiracy shared information about filing fraudulent UI claims and worked together to file fraudulent UI claims, frequently through unauthorized use of the personal identifying information of the purported claimant. (*Id.*) The personal identifying information was used to obtain a unique UI claim number from the state UI agencies for each fraudulent claimant, and claims were paid out under that unique claim number for each claimant.

The FBI recovered Sharodney's cellular phones after executing a search warrant at his home. Those phones revealed that Sharodney, Jennings, and their co-conspirators communicated via text message and telephone in furtherance of the scheme. (PSR ¶¶ 17-21.) In total, the conspiracy resulted in the filing of approximately 450 fraudulent UI claims in 19 different states, with an actual loss of $1,471,599 and an intended loss of $4,997,672. (PSR ¶ 31.)

### B. Frank Jennings and his Co-conspirators Defraud State UI Agencies.

Frank Jennings participated in this scheme to defraud the state UI agencies. Thirty-two fraudulent UI claims have been tied to Jennings. Many of those claims were filed from his residence in Dearborn Heights, but others were filed from Sharodney Harrison's home and used Jennings's phone number as the claimant's

3

phone number. Many of the fraudulent claims tied to Jennings used his home address as the claimant's mailing address, but others used other addresses tied to the conspiracy, such as Edward Taylor's home address and a mailing address in Los Angeles, California. The claims filed from Jennings's home with the Los Angeles address were filed between approximately August 18 and August 25, 2020, during or just before several of his co-conspirators traveled to California to have access to California mailing addresses to commit UI fraud more efficiently.

Jennings communicated with Sharodney and bragged about his success with filing fraudulent claims. For example, Jennings texted[2] Sharodney (**texts on right**) an image from the California Employment Development Department website showing that he had certified claims totaling $15,015 in the name of victim G.B.:

---

[2] All text messages and the video referenced in this memorandum were found on Sharodney Harrison's cellular phones. Reports of those phones were produced in discovery. *See* HARRISON_ALL_000001, HARRISON_ALL_000002.





| **Image 1** | **Image 2 (close up of image Jennings texted to Sharodney Harrison)** |

Jennings also worked with Sharodney and coordinated with other co-conspirators to monitor and collect UI debit cards associated with their fraud. (PSR ¶ 29.)

When the FBI interviewed victim G.B. whose name appears in the top of Image 2 above, she told them that she was denied unemployment benefits during the pandemic because someone had already applied for unemployment in her name. See HARRISON_ALL_000073. She also told the FBI that she has previously been the victim of mortgage fraud, bank fraud, and identity theft. *Id.*

In total, the conspiracy resulted in the filing of approximately 450 fraudulent UI claims in 19 different states, with an actual loss of $1,471,599 and an intended loss of $4,997,672. (PSR ¶¶ 16, 31.)

### C. Jennings Uses the Identity of T.S. to Commit UI Fraud

One of the victims of Jennings's fraud was T.S., whose name, date of birth, and social security number Jennings possessed, transferred, and used to file fraudulent UI claims. (PSR ¶ 46.) Jennings also opened Netspend and Green Dot accounts using T.S.'s information and Jennings later accessed those accounts. (*Id.*) For the Netspend account, Jennings used T.S.'s name, date of birth, and social security number on the account, but Jennings's own mailing address in Dearborn Heights. Jennings then used the account to receive fraudulent UI benefits and repeatedly accessed the Netspend account from his cellular phone and home internet. Netspend records show that the fraudulent funds deposited in the account were spent or withdrawn at Walmart in Livonia, 7 Eleven in Dearborn Heights, and a liquor store in Garden City, among other places in Michigan.

| Transaction Date | Transaction | Credit | Debit | Balance |
|---|---|---|---|---|
| 5/18/20 8:21 AM | This is used for ordering cards internally DO NOT DELETE 701 Brazos AUSTIN,TX 78701 | $0.00 | $0.00 | $0.00 |
| 5/18/20 8:21 AM | Order Debit Card | $0.00 | $0.00 | $0.00 |
| 6/30/20 12:59 PM | CREDIT UIA PRE-PAID CAR\|UI BENEFIT | $7,920.00 | $0.00 | $7,920.00 |
| 7/1/20 5:10 AM | DEBIT Debit: Plan Fee 06/30/2020 | $0.00 | $5.00 | $7,915.00 |
| 7/8/20 12:12 PM | CREDIT UIA PRE-PAID CAR\|UI BENEFIT | $3,040.00 | $0.00 | $10,955.00 |
| 7/13/20 12:12 PM | DEBIT ATM ATM Balance Inquiry Fee | $0.00 | $0.50 | $10,954.50 |
| 7/13/20 12:13 PM | DEBIT ATM ATM Balance Inquiry Fee | $0.00 | $0.50 | $10,954.00 |
| 7/13/20 12:13 PM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $10,951.50 |
| 7/13/20 12:13 PM | DEBIT ATM \|7ELEVEN-FCTI 27150 CHERRY HILL DEARBORN HGHTMIUS | $0.00 | $303.00 | $10,648.50 |
| 7/13/20 12:50 PM | DEBIT PIN \|WAL-MART #2631 29555 PLYMOUTH RD LIVONIA MIUS | $0.00 | $756.67 | $9,891.83 |
| 7/13/20 12:50 PM | DEBIT PIN \|WM SUPERCENTER # Wal-Mart Super Center LIVONIA MIUS | $0.00 | $1,003.74 | $8,888.09 |
| 7/13/20 12:56 PM | DEBIT PIN \|WAL Wal-Mart Super 120478 2631 WAL-SAMS LIVONIA MIUS | $0.00 | $36.21 | $8,851.88 |
| 7/13/20 1:53 PM | DEBIT PIN \|SUNOCO 0277669800 10000 PLYMOUTH RD. DETROIT MIUS | $0.00 | $2.00 | $8,849.88 |
| 7/14/20 4:49 AM | DEBIT SIG 198247000751800\|VZWRLSS*MY VZ VE P 800-922-0204 US | $0.00 | $125.04 | $8,724.84 |
| 7/14/20 1:20 PM | DEBIT PIN \|WAL-MART #2631 29555 PLYMOUTH RD LIVONIA MIUS | $0.00 | $1,003.74 | $7,721.10 |
| 7/14/20 1:24 PM | DEBIT PIN \|WAL-MART #2631 29555 PLYMOUTH RD LIVONIA MIUS | $0.00 | $1,003.74 | $6,717.36 |
| 7/14/20 1:25 PM | DEBIT PIN \|WAL Wal-Mart Super 441672 2631 WAL-SAMS LIVONIA MIUS | $0.00 | $1,003.74 | $5,713.62 |
| 7/14/20 2:06 PM | DEBIT ATM CUONE 29450 W WARREN RD WESTLAND US | $0.00 | $303.50 | $5,410.12 |
| 7/14/20 2:06 PM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $5,407.62 |
| 7/14/20 2:06 PM | DEBIT ATM CUONE 29450 W WARREN RD WESTLAND US | $0.00 | $303.50 | $5,104.12 |
| 7/14/20 2:06 PM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $5,101.62 |
| 7/14/20 2:37 PM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $5,099.12 |
| 7/14/20 2:37 PM | DEBIT ATM CHASE 31311 CHERRY HILL RD WESTLAND US | $0.00 | $303.00 | $4,796.12 |
| 7/16/20 4:53 AM | DEBIT ATM ATM Balance Inquiry Fee | $0.00 | $0.50 | $4,795.62 |
| 7/16/20 4:55 AM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $4,793.12 |
| 7/16/20 4:55 AM | DEBIT ATM CHASE 28925 FORD RD GARDEN CITY US | $0.00 | $303.00 | $4,490.12 |
| 7/16/20 4:56 AM | DEBIT ATM CHASE 28925 FORD RD GARDEN CITY US | $0.00 | $43.00 | $4,447.12 |
| 7/16/20 4:56 AM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $4,444.62 |
| 7/17/20 4:15 AM | DEBIT ATM \|COMERICA-MICHIGAN REGION 25745 FORD RD DEARBORN HEIGMIUS | $0.00 | $303.00 | $4,141.62 |
| 7/17/20 4:15 AM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $4,139.12 |
| 7/17/20 4:16 AM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $4,136.62 |
| 7/17/20 4:16 AM | DEBIT ATM \|COMERICA-MICHIGAN REGION 25745 FORD RD DEARBORN HEIGMIUS | $0.00 | $303.00 | $3,833.62 |
| 7/17/20 1:16 PM | DEBIT ATM \|MCKs Wine Shoppe 927 INKSTER GARDEN CITY MIUS | $0.00 | $202.50 | $3,631.12 |
| 7/17/20 1:16 PM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $3,628.62 |
| 7/18/20 3:11 AM | DEBIT ATM MCI1 1620 N TELEGRAPH RD DEARBORN US | $0.00 | $303.50 | $3,325.12 |
| 7/18/20 3:11 AM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $3,322.62 |
| 7/18/20 3:27 AM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $3,320.12 |
| 7/18/20 3:27 AM | DEBIT ATM \|COMERICA-MICHIGAN REGION 25745 FORD RD DEARBORN HEIGMIUS | $0.00 | $303.00 | $3,017.12 |
| 7/18/20 2:06 PM | DEBIT PIN \|WM SUPERCENTER # Wal-Mart Super Center LIVONIA MIUS | $0.00 | $1,003.74 | $2,013.38 |
| 7/20/20 11:48 PM | DEBIT ATM Domestic ATM Fee | $0.00 | $2.50 | $2,010.88 |
| 7/20/20 11:48 PM | DEBIT ATM \|COMERICA-MICHIGAN REGION 13233 EAST JEFFERSON DETROIT MIUS | $0.00 | $303.00 | $1,707.88 |
| 7/21/20 11:16 AM | DEBIT 7162\|4484\|All-Access | $0.00 | $1,707.88 | $0.00 |

See HARRISON_ALL_002348. T.S. lives outside of Michigan and told the FBI that he did not file UI claims in his name in Arizona, California, North Carolina, or Michigan. *See* HARRISON_ALL_004704. He did not authorize anyone to file claims on his behalf. *Id.*

**D.  Procedural History**

Jennings was charged in an eight-count Superseding Indictment with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count 1) and Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A (Count 8). (ECF No. 133.) He pleaded guilty to both counts pursuant to a Rule 11 agreement. (ECF No. 198.) The government recommended that Jennings's sentence of imprisonment not exceed the midpoint of his guideline range, as determined by the Court, to be followed by a two-year term of supervised release. (*Id.* at PageID.630.)

In the Rule 11 agreement, the parties recommended that the following guideline provisions should apply:

| USSG § 2B11(a)(1) | Fraud base offense level |
| USSG § 2B1.1(b)(1)(H) | Loss over $550,000 |
| USSG § 2B1.1(b)(2)(A)(i) | 10 or more victims |

(*Id.* at PageID.628–629.) Therefore, parties agreed that the actual loss amount should be used to calculate the guideline range, which the parties determined would result in a total offense level (including acceptance of responsibility) of 20, and an aggregate guideline range of 57 to 65 months. The Probation Department completed a presentence investigation report, which used the intended loss amount to calculate a total offense level of 24 and an aggregate guideline range of 75 to 87 months. (PSR ¶ 94.)

8

There is one outstanding guideline issue related to the loss amount and sentencing is set for September 28, 2023.

## II.   OUTSTANDING SENTENCING ISSUE – LOSS AMOUNT

In the Rule 11 agreement, the parties jointly recommended that the actual loss of $1,471,599 sustained by the state unemployment insurance agencies should control for calculating Jennings's guideline range. (ECF No. 198, PageID.628.) This would result in a 14-point enhancement under U.S.S.G. § 2B1.1(b)(1)(H), and a guideline range of 33 to 41 months on Count 1, with an aggregate range of 57 to 65 months. The Probation Department calculated the guideline range based on the intended loss amount of $4,997,672, which results in a 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J), and an aggregate guideline range of 75 to 87 months. (PSR ¶¶ 56, 94, 95.)

Jennings submitted an objection to the PSR related to the use of the intended loss amount. Recently, the Sixth Circuit deferred to the Sentencing Commission's interpretation of loss, because the term "has no one definition" and "can mean different things in different contexts." *See United States v. You*, No. 22-5442, 2023 WL 4446497, at *12-*13 (6th Cir., July 11, 2023). Given the Court's finding that the term "loss" can have more than one meaning, it disagreed with the Third Circuit's holding in *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), and held that intended loss may be an appropriate measure of loss under USSG § 2B1.1 in

9

some circumstances. But the Court noted that "the purpose of estimating 'loss' is to assess 'the seriousness of the offense and the defendant's relative culpability'" and because "federal theft statutes can 'cover a broad range of conduct with extreme variation in severity,' the loss *caused or intended* allows courts to issue sentences that reflect defendants' 'relative culpability.'" *You*, 2023 WL 4446497, at *13 (citing USSG § 2B1.1 cmt. (background)) (emphasis added). In an even more recent case, the Court reaffirmed *You*'s holding, though the concurrence suggests that there is not a consensus on this issue. *United States v. Kennert*, No. 22-1998, 2023 WL 4977456, at *3 (6th Cir. Aug. 3, 2023) and *4 (Murphy, J., concurring).

Based on the facts of this case, the parties agree that the actual loss number appropriately reflects the defendant's culpability, the seriousness of the offense, and will avoid sentencing disparities between Jennings and similar defendants charged with comparable crimes. Because the parties agree to the use of actual loss based on the facts of this case, the government requests that this Court apply a 14-level enhancement, instead of an 18-level enhancement based on the intended loss.

## III. SECTION 3553(A) FACTORS

Congress provided the objectives and factors that courts are to consider when imposing a sentence in 18 U.S.C. § 3553(a). The government addresses the most relevant § 3553(a) factors below, and respectfully submits that they support a

10

sentence at the bottom of the guideline range, to be followed by a two-year term of supervised release

### A. The Nature and Circumstances of the Offenses

The nature and circumstances of Jennings's offenses are serious. Over several months, he and his co-conspirators defrauded several state unemployment insurance agencies during a global pandemic, at a time when many Americans relied on unemployment insurance to survive. In total, they defrauded the state agencies of $1,471,599, attempted collect millions of dollars more, and used the personal identifying information of hundreds of victims to commit the fraud. These victims are real people whose own benefits or ability to open new lines of credit may have been cut off when many were already suffering the financial implications of the Covid-19 pandemic.

Jennings personally filed or caused to be filed over 30 fraudulent claims with state UI agencies in Arizona, California, Hawaii, Michigan, North Carolina, New Jersey, Nevada, and Washington. He also opened a Netspend account in the name of T.S. and spent the fraudulent proceeds at local stores. Jennings did not file one or two fraudulent claims and stop. Instead, his fraud spanned months, involved planning and coordination, and required that he and his co-conspirators disregard the hardship that they might cause real victims. The nature and circumstances of his offenses warrant a sentence at the bottom of his guideline range.

### B. The History and Characteristics of Frank Jennings

Jennings has no prior criminal convictions,[3] a solid work history, and family support, nonetheless he decided to commit fraud. He reports having a great childhood where all his needs were met, a good relationship with his two adult children, and an excellent relationship with his significant other. (PSR ¶¶ 75–79.) He is prescribed medication for hip pain and high blood pressure but suffers from no mental or emotional problems. (*Id.* at ¶¶ 83–84.) He has a history of alcohol and marijuana use but denies the use of the other drugs. (*Id.* at ¶ 86.)

Jennings is a high school graduate and has taken college courses. (*Id.* at ¶ 87.) He has worked at Chrysler from October 2018 to the present and was previously employed at Ajax Metal Processing from June 2016 through February 2018. (*Id.* at ¶¶ 88–89.)

Unfortunately, despite a crime-free past and stable upbringing, Jennings turned to fraud during the pandemic to make easy money.

### C. Seriousness of the Offense, Promotion of Respect for the Law, and Just Punishment for the Offense

The requested sentence will promote respect for the law, reflect the seriousness of the offense, and provide just punishment. Jennings and his co-

---

[3] The government acknowledges that Jennings is a zero-point offender and the court may wish to consider this at sentencing.

conspirators exploited government services during a global pandemic and used the personal information of hundreds of victims in the process. The requested sentence will help ensure that he follows the law in the future and does not again turn to fraudulent and criminal behavior to make or save money.

### D. Adequate Deterrence and Protection of the Public

Deterrence and protection of the public are important considerations in this case. As the Court knows, there has been a spike in fraud committed against the government related to pandemic assistance, and unemployment fraud continues to be a significant problem in Michigan. *See* UIA says it blocked 10,000-plus fraudulent claims in late July, Detroit News (Aug. 30, 2023), *available at* https://www.detroitnews.com/story/news/local/michigan/2023/08/09/michigan-unemployment-insurance-agency-fraudulent-claims-uia-checks-identity-theft-false-filings/70553649007/ (last visited Sept. 20, 2023). Indeed, a recent Government Accountability Office report estimates that between $100 billion and $135 billion in fraudulent UI benefits was paid out during the Covid-19 pandemic. *See* https://www.gao.gov/products/gao-23-106696 (last visited Sept. 14, 2023). The government provided this assistance as a lifeline to individuals who were struggling during the difficult circumstances posed by the Covid-19 pandemic and associated lockdowns. Given the unprecedented need for aid, the agencies relied, to some degree, on the integrity of those applying for benefits. But many, like

Jennings, chose to exploit the pandemic to make quick money at the expense of government agencies. The requested sentence would serve the interest of general deterrence and hopefully prevent others from committing similar fraud. It would also protect the public and government from further crimes by Jennings and other would-be fraudsters.

      E.      **The Need to Avoid Unwarranted Sentencing Disparities.**

A sentence at the bottom of the guideline range would avoid unwarranted sentencing disparities between similar defendants. Assuming the Court accepts the parties' recommendation regarding the loss amount, the United States Sentencing Commission's JSIN information shows that the average length of imprisonment was 49 months, and the median length of imprisonment was 50 months for individuals sentenced between 2018 and 2022 whose primary guideline was USSG § 2B1.1 with a Total Offense Level of 20 and Criminal History Category I and who were convicted of at least one count of 18 U.S.C. §1028A.

But Jennings's conduct warrants a sentence above the average and median sentences reported above. It is unlikely that every individual with a Total Offense Level of 20 participated in a widespread scheme that used the personal identifying information of hundreds of people. Indeed, Jennings received the same two-level enhancement under USSG § 2B1.1(b)(2)(A)(i) for more than 10 victims as a defendant who defrauded eleven people. The number of victims in this case is an

aggravating circumstance that warrants a sentence above the average and median numbers described above. The Court's sentence in this case should seek to avoid unwarranted sentencing disparities between similarly situated defendants.

## IV. CONCLUSION

For the reasons described above, the Government respectfully recommends a sentence at the bottom of Jennings's guideline range, to be followed by a two-year term of supervised release.

                Respectfully submitted,

                DAWN N. ISON
                United States Attorney

                *s/ Meghan S. Bean*
                Meghan Sweeney Bean
                Assistant United States Attorney
                211 W. Fort St., Suite 2001
                Detroit, MI 48226
                (313) 226-0214
                meghan.bean@usdoj.gov

Dated: September 21, 2023

**CERTIFICATE OF SERVICE**

I certify that on September 21, 2023, I electronically filed the foregoing document with the Clerk of the Court of the Eastern District of Michigan using the ECF system which will send notification of such filing to all counsel of record.

*s/ Meghan S. Bean*
Meghan Sweeney Bean
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI  48226
(313) 226-0214
meghan.bean@usdoj.gov